IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 13, 2024 Session

## IN RE ESTATE OF JAMES A. PRICE

**Appeal from the Probate Court for Shelby County**
**No. PR-12729          Joe Townsend, Judge**

_____

### No. W2023-01508-COA-R3-CV
_____

In this estate case, appellant, decedent's son, and appellee, decedent's partner of twenty-seven years, are the beneficiaries of decedent's will. The will appointed the parties co-executors, and they served in this capacity for several months until disputes arose between them and this litigation ensued. In its final order, the trial court found in favor of appellee on every disputed issue. On appeal, appellant raises issues concerning the trial court's: (1) rulings during trial; (2) final order; and (3) award of attorney's fees to appellee. Both parties ask for an award of appellate attorney's fees. Because the evidence does not support the attorney's fee amount awarded to appellee, and because the trial court failed to consider the relevant reasonableness factors, we vacate this award and remand for a new determination of reasonable attorney's fees owed to appellee. The trial court's orders are otherwise affirmed. We grant appellee's request for appellate attorney's fees, and we deny appellant's request for same. Appellee's request for frivolous appeal damages is denied.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Probate Court**
**Vacated in Part; Affirmed in Part; and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and CARMA DENNIS MCGEE, J., joined.

Gordon B. Olswing and J. Conner Ray, Memphis, Tennessee, for the appellant, Kevin Price.

Regan S. Steepleton, Brian L. Yoakum, and M. Matthew Thornton, Memphis, Tennessee, for the appellee, Judy Parker.[1]

## OPINION

### I. Background

_____
[1] The Estate of James A. Price elected not to file a brief in this appeal.

On November 9, 2010, James A. Price ("Decedent") executed his Last Will and Testament ("Will"). The beneficiaries under the Will were Decedent's two children, Morgan Austin and Appellant Kevin Price, and Decedent's long-term partner, Appellee Judy Parker. In the Will, Appellant and Appellee were named Co-Executors of Decedent's estate ("Estate"). The Will also contained a provision concerning the Co-Executors' compensation, discussed further, *infra*.

Relevant here, the Will specifically bequeathed to Appellee: (1) $50,000.00; (2) Decedent's vacation home located at 1030 Scenic Gulf Drive, Destin, Florida ("Florida Condo"); (3) all personal and household effects located in or about the Florida Condo; and (4) except as provided specifically in the Will, all of Decedent's personal and household effects. The Will specifically bequeathed to Appellant: (1) "Airplane-related gifts," including three airplanes, Decedent's interest in the real property on which an airplane hangar was situated, and all tools and equipment used with respect to the airplanes; and (2) Decedent's residuary estate. The residuary estate included Decedent's primary residence located at 195 Walnut Bend Cove, Cordova, Tennessee ("Walnut Bend Home") and a portfolio of approximately thirty rental properties in the Memphis area, discussed *infra*.

On November 21, 2018, Decedent died. Ms. Austin predeceased Decedent, leaving Appellant and Appellee as the remaining beneficiaries under the Will. On November 27, 2018, Appellant and Appellee petitioned the Shelby County Probate Court ("trial court") to probate the Will and appoint them Co-Executors of the Estate. At the time, Appellant resided in Glen Allen, Virginia, and Appellee resided in Memphis, Tennessee. Attorney Susan Callison represented Appellant and Appellee in their petition. That same day, the trial court admitted the Will to probate and appointed Appellant and Appellee as Co-Executors of the Estate. For sixteen months, the parties worked well together to administer the Estate. However, a dispute arose between the parties concerning Appellee's fee as Co-Executor of the Estate; in March 2020, Appellee hired separate counsel to address the issue of her fee. Dialogue with Appellant concerning Appellee's fee precipitated the animosity and litigation between the parties. In the interest of judicial economy, we recite only the facts and procedure relevant to this appeal.

On May 7, 2020, Appellant filed a petition ("Appellant's First Petition"), seeking, *inter alia*, to: (1) set an executor's fee; (2) award attorney's fees; (3) determine Florida property expenses; (4) compel distribution of Estate assets to beneficiary, and (5) determine ownership of personal property. Therein, Appellant alleged, *inter alia*, that Appellee was not entitled to an executor's fee. In the alternative, Appellant asserted that Appellee's executor's fee should not exceed $41,000.00. On March 25, 2021, Appellant filed a notice of voluntary dismissal of Appellant's First Petition. On March 26, 2021, the trial court entered an order of voluntary nonsuit without prejudice.

On May 18, 2020, Appellee filed a motion for injunctive relief against Appellant

alleging that Appellant took Decedent's personal items from the Walnut Bend Home. On June 8, 2021, Appellant filed a response to Appellee's motion for injunctive relief. Also, on June 8, 2021, Appellant filed a motion to order Co-Executor to set and request executor fees or waive her fees and costs. In view of the animosity between the parties, on July 8, 2021, the trial court, *sua sponte*, entered an order removing them as Co-Executors and appointing Attorney Lynn Thompson as Administrator of the Estate.[2]

On October 5, 2021, Appellee filed a petition to set fees and expenses for Co-Executor. Appellee asked for fees and expenses related to: (1) her efforts to obtain the return of Decedent's personal and household effects that Appellant took with him to Virginia; and (2) the time and effort she expended in administering the Estate prior to the trial court's order removing her as Co-Executor. That same day, Appellee filed a motion for return of the disputed personal property, wherein she argued that Appellant refused to return any of Decedent's personal property to Attorney Thompson while the litigation was pending. Appellee also alleged that she had given Decedent's coin collection to Attorney Thompson, who was holding the collection pending the trial court's determination of ownership. Also, on October 5, 2021, Appellee filed a petition seeking return of the coin collection, which she alleged was part of Decedent's personal and household items bequeathed to her under the Will.

On December 28, 2021, Appellant filed a response to Appellee's motion to return personal property. That same day, Appellant filed a response to Appellee's petition to set fees and expenses and a counter-petition ("Appellant's Second Petition"). In Appellant's Second Petition, he argued that Appellee was not entitled to fees and expenses and that Appellee was obligated to reimburse the Estate and Appellant "for the expenses, losses and damages caused by her" and her failure "to faithfully discharge her duties as fiduciary to the Estate and/or" Appellant. Appellant's Second Petition alleged that Appellee breached her fiduciary duties to the Estate and to Appellant, as the beneficiary of the residual estate. Appellant also filed a response to Appellee's petition concerning the coin collection. Appellee did not file a reply to Appellant's Second Petition.

On January 4, 2022, Attorney Thompson filed a motion to dismiss Appellee's petition to set fees and expenses. Also, on January 4, 2022, Attorney Thompson filed a declaratory judgment action to determine ownership of the coin collection, and a motion to assess real property expenses against Appellee for expenses related to the Florida Condo and Appellee's alleged delay in transferring this asset. On July 21, 2022, Appellee filed a supplemental petition to set fees and expenses. Therein, she alleged that she was entitled to an award of fees and expenses totaling $300,000.00. On August 31, 2022, the trial court denied the motion to dismiss Appellee's petition to set fees and expenses.

---

[2] On November 8, 2022, the trial court entered a consent order allowing Attorney Callison to withdraw and substituting Attorney Thompson as the attorney of record.

On January 17, 2023, and January 18, 2023, without holding an evidentiary hearing, the trial court entered a series of orders, wherein it: (1) awarded Appellant Decedent's military artifacts and other family heirlooms; (2) awarded Appellant the coin collection; (3) found that, while Appellee did not breach her duty to the Estate or to Appellant, she was not entitled to an executor's fee; (4) ordered the parties to split Attorney Thompson's fee; and (5) ordered Appellee to reimburse the Estate for the expenses it paid towards the Florida Condo. Both parties filed timely motions to alter or amend.

On March 31, 2023, Appellee filed a renewed and amended motion to alter or amend the trial court's previous orders denying her an executor's fee and requiring her to pay half of Attorney Thomspon's attorney's fees. On April 12, 2023, Appellant filed a response to the renewed and amended motion to alter or amend and to Appellee's other motions to alter or amend.

By order of April 20, 2023, the trial court set aside its January 17 and 18, 2023 orders. That day, the trial court also entered an order removing Attorney Thompson as Administrator and appointing Attorney Paul Royal to serve as the personal representative of the Estate.

On June 23, 2023, Appellant filed amended responses to Appellee's supplemental petition to set fees and expenses and an amended counter-petition ("Appellant's Amended Petition"). On August 22, 2023, Appellee filed a response to Appellant's Amended Petition.

From August 28, 2023 through August 30, 2023, the trial court heard Appellee's supplemental petition to set fees and expenses and Appellant's Amended Petition. The following witnesses testified: (1) Appellant; (2) Appellee; (3) Attorney Callison; (4) Attorney Thompson; (5) Attorney Royal; and (6) Ashley Campbell.[3] At the close of Appellee's proof, Appellant moved for involuntarily dismissal, and the trial court denied the motion.

In its October 5, 2023 order, the trial court made extensive findings of fact and conclusions of law and reversed itself on nearly all of the issues addressed in its January 17 and 18, 2023 orders. As discussed below, the trial court concluded that: (1) Appellee fulfilled her obligations as Co-Executor and did not breach her fiduciary duty; (2) Appellee was entitled to $90,000.00 for administration of the Estate; (3) the coin collection was tangible personal property bequeathed to Appellee; (4) the Estate owed Appellee $1,900.00 for the prorated taxes that she paid on the Florida Condo at closing; and (5) the personal property Appellant took from Decedent's home should be returned to Appellee. The trial court also made a specific finding that Appellee's "testimony over almost two days was

---

[3] Ms. Campbell works for Advantage Property Management, LLC ("Advantage") one of the companies that managed Decedent's rental properties, discussed further, *infra*.

calm, not defensive, and truthful."

On October 9, 2023, Appellee filed a motion for attorney's fees incurred in her successful defense of Appellant's breach of fiduciary duty claim. On October 31, 2023, Appellant filed a response in opposition to Appellee's motion. On February 21, 2024, the trial court denied Appellee's motion. On March 12, 2024, Appellee filed a motion to alter or amend the trial court's order. On April 5, 2024, Appellant filed a response to the motion to alter or amend. By order of May 17, 2024, the trial court granted Appellee's motion to alter or amend and reversed its denial of attorney's fees, awarding Appellee $68,000.00 in fees to be paid by the Estate. Appellant filed a timely appeal.

## II. Issues

Appellant raises nineteen issues for review, as stated in his brief:[4]

1. The Trial Court abused its discretion by not admitting the exhibits proffered by [Appellant].

2. The Trial Court erred in not assessing [Appellee] for the fees of the Estate's various Administrator[s] to the extent said fees exceeded the normal and customary costs of probate and resulted from [Appellee]'s acts and omissions.

3. The Trial Court erred in *sua sponte* removing [Attorney] Thompson as Administrator[], and/or barring [Attorney] Thompson from representing the interests of the Estate.

4. The Trial Court erred in requiring [Attorney Royal] to remain neutral as Administrator[], and/or barring [Attorney] Royal from representing the interests of the Estate.

5. The Trial Court abused its discretion in not recognizing [Attorney Thompson] as a lay witness able to offer opinion testimony.

6. The Trial Court abused its discretion in not allowing [Attorney] Thompson to give testimony regarding her actions and findings or concerns about the Estate, [Appellee], and [Appellant].

7. The Trial Court abused its discretion in not allowing [Appellant] to make a proffer of [Attorney] Thompson's testimony.

---

[4] For reasons discussed below, we review Appellant's issues in a different order from that presented in his brief. However, the issues are stated verbatim.

8. The Trial Court abused its discretion in its evidentiary rulings against [Appellant] and/or in favor of [Appellee].

9. The Trial Court erred in finding that [Appellee] did not breach her fiduciary duty to the [Estate].

10. The Trial Court erred in finding that [Appellee] did not breach her duty to [Appellant].

11. The Trial Court erred in not awarding damages to the Estate against [Appellee].

12. The Trial Court erred in not awarding damages to [Appellant] against [Appellee].

13. The Trial Court erred in awarding [Appellee] a fee for her services as Co-Executor, or alternatively awarded [Appellee] an unreasonable fee in light of the circumstances.

14. The Trial Court erred in finding that [Appellee] was entitled to the expenses paid towards the [Florida Condo] by the Estate.

15. The Trial Court erred in awarding [Appellee] the Decedent's Coin Collection.

16. The Trial Court erred in awarding [Appellee] items of personalty that belonged to [Appellant] as a child.

17. The Trial Court erred by denying [Appellant]'s motion for involuntary dismissal.

18. The Trial Court erred in awarding [Appellee] her attorney's fees.

19. [Appellant] should be awarded his attorney's fees and expenses on this appeal.

Appellee raises three additional issues for review, as stated in her brief:

1. Whether [Appellant's] appeal should be dismissed for his failure to comply with Tennessee Rule of Appellate Procedure 27(a)(7)?

2. Whether this is a frivolous appeal because no evidence exists in the record upon which Appellant can reasonably rely for this appeal?

3. Whether Appellee is entitled to an award of additional attorney's fees and expenses for successfully defending this appeal?

### III. Standard of Review

We review a non-jury case "*de novo* upon the record with a presumption of correctness as to the findings of fact, unless the preponderance of the evidence is otherwise." *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000) (citing Tenn. R. App. P. 13(d)). The trial court's conclusions of law are reviewed *de novo* and "are accorded no presumption of correctness." *Brunswick Acceptance Co., LLC v. MEJ, LLC*, 292 S.W.3d 638, 642 (Tenn. 2008). Given the number of issues raised in this appeal, where a standard of review differs from that set out above, we will discuss it under that issue heading.

We also note that this Court is "required to defer to the trial court's credibility findings, including those that are implicit in its holdings." *Williams v. City of Burns*, 465 S.W.3d 96, 120 (Tenn. 2015); *see also* *Street v. Street*, No. E2016-00531-COA-R3-CV, 2017 WL 1177034, at \*7 (Tenn. Ct. App. Mar. 29, 2017). In *Wells v. Tennessee Board of Regents*, 9 S.W.3d 779 (Tenn. 1999), the Tennessee Supreme Court explained that

> trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990); *Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991). Thus, trial courts are in the most favorable position to resolve factual disputes hinging on credibility determinations. *See Tenn-Tex Properties v. Brownell-Electro, Inc.*, 778 S.W.2d 423, 425-26 (Tenn. 1989); *Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998). Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. *See Humphrey v. David Witherspoon, Inc.*, 734 S.W.2d 315, 315-16 (Tenn. 1987); *Bingham v. Dyersburg Fabrics Co., Inc.*, 567 S.W.2d 169, 170 (Tenn. 1978).

*Wells*, 9 S.W.3d at 783. Accordingly, we defer to the trial court's finding that Appellee's "testimony over almost two days was calm, not defensive, and truthful." With the foregoing in mind, we turn to the substantive issues.

## IV. Analysis

In the interest of judicial economy, we have grouped the issues into the following six categories: (1) waived issues; (2) evidentiary issues; (3) estate administration; (4) disputed property; (5) motion for involuntary dismissal; and (6) attorney's fees.

## A. Waived Issues

Concerning four of his stated issues, Appellant fails to comply with Tennessee Rule of Appellate Procedure 27(a)(7)(A), which provides that an appellant's brief shall contain:

(7) An argument, which may be preceded by a summary of argument, setting forth:

> (A) the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on;

Tenn. R. App. P. 27(a)(7)(A). Similarly, as to these four stated issues, Appellant fails to comply with Tennessee Court of Appeals Rule 6, which requires a written argument for *each issue* on appeal. Tenn. R. Ct. App. 6. The required written argument *shall* contain:

> (1) A statement by the appellant of the alleged erroneous action of the trial court which raises the issue and a statement by the appellee of any action of the trial court which is relied upon to correct the alleged error, with citation to the record where the erroneous or corrective action is recorded.
>
> (2) A statement showing how such alleged error was seasonably called to the attention of the trial judge with citation to that part of the record where appellant's challenge of the alleged error is recorded.
>
> (3) A statement reciting wherein appellant was prejudiced by such alleged error, with citations to the record showing where the resultant prejudice is recorded.
>
> (4) A statement of each determinative fact relied upon with citation to the record where evidence of each such fact may be found.

Tenn. R. Ct. App. 6(a). Furthermore, "[n]o complaint of or reliance upon action by the trial court" and/or "[n]o assertion of fact will be considered on appeal unless the argument contains a reference to the page or pages of the record" where such action and/or evidence of such fact is recorded. Tenn. R. Ct. App. 6(b).

The Tennessee Supreme Court has explained that "[a]n issue may be deemed waived, even when it has been specifically raised as an issue, when the brief fails to include an argument satisfying the requirements of [Tennessee Rule of Appellate Procedure] 27(a)(7)." *Hodge v. Craig*, 382 S.W.3d 325, 335 (Tenn. 2012); *see also Forbess v. Forbess*, 370 S.W.3d 347, 355 (Tenn. Ct. App. 2011) ("This [C]ourt has repeatedly held that a party's failure to cite authority for its arguments or to argue the issues in the body of its brief constitute a waiver on appeal."); *Bean v. Bean*, 40 S.W.3d 52, 55 (Tenn. Ct. App. 2000) ("Courts have routinely held that the failure to make appropriate references to the record and to cite relevant authority in the argument section of the brief as required by Rule

- 8 -

27(a)(7) constitutes a waiver of the issue.").  As this Court has stated:

> "[T]his Court is not charged with the responsibility of scouring the appellate record for any reversible error the trial court may have committed." [***Owen v. Long Tire***, LLC, No. W2011-01227-COA-R3-CV, 2011 WL 6777014, at *4 (Tenn. Ct. App. Dec. 22, 2011)].  "It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." ***Sneed v. Bd. of Prof'l Responsibility of Sup. Ct.***, 301 S.W.3d 603, 615 (Tenn. 2010).

***

> "[T]he Supreme Court has held that it will not find this Court in error for not considering a case on its merits where the plaintiff did not comply with the rules of this Court." ***Bean***, 40 S.W.3d at 54-55 (citing ***Crowe v. Birmingham & N.W. Ry. Co.***, [1 S.W.2d 781] (1928)).  "[A]ppellate courts may properly decline to consider issues that have not been raised and briefed in accordance with the applicable rules." ***Waters v. Farr***, 291 S.W.3d 873, 919 (Tenn. 2009).

***Clayton v. Herron***, No. M2014-01497-COA-R3-CV, 2015 WL 757240, at *2-3, (Tenn. Ct. App. Feb. 20, 2015).

The first waived issue concerns whether the trial court abused its discretion "by not admitting the exhibits proffered by" Appellant.[5]  Appellant's brief fails to provide any substantive argument concerning this issue.  More fatal to the issue is Appellant's failure to specifically identify the exhibits in question.  As such, there is nothing for this Court to review, and this issue is waived.

The second waived issue concerns whether the trial court erred "in not assessing [Appellee] for the fees of the Estate's various Administrator[s] to the extent said fees exceeded the normal and customary costs of probate and resulted from [Appellee's] acts and omissions."[6]  Again, Appellant's brief does not contain any substantive argument concerning this issue.  Rather, under the damages argument section of his brief, addressed *infra*, Appellant merely alleges that Attorney "Thompson charged administrative fees and costs of $33,000.00," and notes that "***Roy v. Diamond***, 16 S.W.3d 783 (Tenn. Ct. App. 1999) provides that increased costs in administration are recoverable damages against a bad executor."  Based solely on these statements, Appellant asks "for an award of these

---

[5] This is Appellant's thirteenth issue on appeal.

[6] This is Appellant's fifth issue on appeal.

- 9 -

damages" against Appellee. At best, Appellant's argument is skeletal and does not comply with the briefing requirements set out above. *Sneed*, 301 S.W.3d at 615. As such, the issue is waived.

The last two waived issues concern whether the trial court erred when it *sua sponte* removed Attorney Thompson as Administrator, appointed Attorney Royal as Administrator, and ordered Attorney Royal to remain neutral.[7] It appears that Appellant combined these issues into one argument in his brief, to-wit:

> The [t]rial [c]ourt took the unusual step of barring [Attorneys] Thompson and Royal, the Administrator[s], from advocating for or protecting the interests of the Estate in this matter. These rulings presented problems as most of the claims asserted by [Appellant] rightfully belonged to the Estate. Thompson noted this when [Appellee's counsel] complained about having to fight [Attorney] Thompson and [Appellant]. (Vol. 7, pp. 62-63). It is a fundamental principle of probate law that, "[a]n executor or administrator . . . has the right and duty to maintain all suits in equity and law that may be necessary to reduce the estate's property to his possession and control, and in all suits by or against the estate the executor or administrator is a necessary party." *In re Estate of Dusina*, 1984 Tenn. App. LEXIS 2658, *5-6 (Tenn. Ct. App. Feb. 7, 1984) (internal citation omitted). The Administrators should have represented the interests of the Estate, which would have spared [Appellant] from the personal effort and expenses litigating [Appellee]'s bad acts. The [t]rial [c]ourt's ruling as to the Administrator[s] was reversible error.

Appellant fails to specify which Estate interests Attorneys Thompson and Royal were barred from representing and/or protecting, and he fails to provide record citations to support his allegations. *See* Tenn. R. App. P. 27(a)(7)(A); Tenn. R. Ct. App. 6(b). Rather, Appellant broadly asserts that the Administrators "should have represented the interests of the Estate" and that "most of the claims asserted by [Appellant] rightfully belonged to the Estate." Furthermore, Appellant fails to cite any law to support his contention that the trial court erred when it *sua sponte* removed Attorney Thompson and appointed Attorney Royal. It is not this Court's duty to research and construct Appellant's argument. In the absence of a specific argument with sufficient support, Appellant's issues concerning the trial court's removal of Attorney Thompson and its requirement that Attorney Royal remain neutral are waived. *Sneed*, 301 S.W.3d at 615. We now turn to the evidentiary issues.

## B. Evidentiary Issues

We begin with the evidentiary issues arising from the final hearing. These issues

---

[7] This discussion concerns Appellant's sixteenth and seventeenth issues on appeal.

concern the trial court's rulings on Attorney Thompson's and Attorney Royal's respective testimony. In Tennessee, "a trial court's ruling on the admissibility of evidence is within the sound discretion of the trial judge." *Dickey v. McCord*, 63 S.W.3d 714, 723 (Tenn. Ct. App. 2001). As such, a "trial court's evidentiary ruling will only be overturned on appeal upon a showing of abuse of discretion." *Id.* (citing *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992)). "A trial court abuses its discretion if it applies an incorrect legal standard or reaches an illogical or unreasonable decision that causes an injustice to the complaining party." *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 273 (Tenn. 2005) (citing *State v. Stevens*, 78 S.W.3d 817, 832 (Tenn. 2002)). Even if the trial court abused its discretion, we will not set aside the trial court's judgment unless Appellant can show that the error "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). With the foregoing in mind, we turn to Appellant's evidentiary issues.

### i. Attorney Thompson's Testimony[8]

Appellant raises three issues concerning Attorney Thompson's testimony. First, Appellant asserts that the trial court erred when it refused to recognize Attorney Thompson as a lay witness who was able to offer opinion testimony. Second, Appellant argues that the trial court erred when it refused to allow Attorney Thompson to testify concerning her "actions and findings or concerns" about the Estate, Appellee, and Appellant. Finally, Appellant argues that the trial court erred when it refused Appellant's request to make an offer of proof on Attorney Thompson's testimony.

Although Attorney Thompson testified at the final hearing, the trial court limited the scope of that testimony to the facts she observed, and she did not testify as an expert. In his brief, Appellant argues that Attorney Thompson "agreed with [Appellant's] positions in this litigation [] and opposed [Appellee]." It appears that the crux of Appellant's appellate argument is that Attorney Thompson should have been allowed to offer opinion testimony as to "the time that was spent on this Estate versus what should have been spent on this Estate." In his reply brief, Appellant alleges that Attorney "Thompson's testimony was based on her perception[] and would have helped the [t]rial [c]ourt in determining whether [Appellee] breached her duty."

Turning to the transcript, Attorney Thompson testified that: (1) the Estate had been open for more than a year-and-a-half when she was appointed as Administrator; (2) the assets of the Estate were not distributed in a timely manner but could have been; (3) there were delays in distributing real property, specific bequests, and the residual real property;

---

[8] This section concerns Appellant's tenth, eleventh, and twelfth issues on appeal.

(4) Appellee's request to reach a settlement for her executor fee caused the case to "snowball" out of control; and (5) Attorney Thompson regularly closes estates in a year-and-a-half and ordinary estates could close in such time. The following portion of Attorney Thompson's cross-examination testimony is telling:

Q: Early on in your testimony, you referenced that it's the executor fee that snowballed the case. You used the word snowballed. And, if I understood you correctly, that's really all that remained to be thought about; is that correct?

A: Well, I – what I meant by snowballing is, all right, the real property, everything had been transferred, and it wasn't until the request for an executor's fee had taken place that you [(Appellee's attorney)], you were engaged, and then you started filing things like getting this tangible personal property back after [Appellant] had had it for two years.

***I saw this as a tete-a-tete, all right, you're not going to pay me what I want in an executor's fee then I'm going to get this, your daddy's, you know, uniform back. And it just became – it wasn't about what was on paper. It was going to be, you know, litigation by fireball.***

***

Q: Just making sure we're clear, that the tit-for-tat, tete-a-tete that you used was your interpretation, not from – you didn't get that talking to [Appellee]?

A: No.

(Emphasis added). The foregoing testimony demonstrates that Attorney Thompson: (1) believed that the Estate was not closed in a timely manner; and (2) blamed Appellee for the failure to close the Estate in a timely manner and the ensuing litigation between the parties. The crux of Attorney Thompson's testimony is in fact her opinion that the administration of the Estate was prolonged unnecessarily. This testimony belies Appellant's argument that he was prohibited from eliciting such opinion testimony from Attorney Thompson. Accordingly, this issue is without merit.

After lengthy questioning by both attorneys, Appellant's counsel, on re-direct, asked Attorney Thompson whether the actions she took against Appellee were necessary as administrator of the Estate. Counsel for Appellee objected to this question on the ground that it was outside the scope of direct examination, and the trial court sustained the objection. When Appellant's counsel asked to make an offer of proof to preserve the record for appeal, the trial court refused. Tennessee Rule of Evidence 103(a)(2) provides that an "[e]rror may not be predicated upon a ruling which . . . excludes evidence unless a

- 12 -

substantial right of the party is affected, and . . . the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer **or were apparent from the context**." Tenn. R. Evid. 103(a)(2) (emphasis added). Indeed, the purpose of an offer of proof is to provide the appellate court with a record of the evidence that *would have* been presented so that "'the appellate court can determine whether or not [inclusion or exclusion of evidence] was reversible.'" **Harwell v. Walton**, 820 S.W.2d 116, 118 (Tenn. Ct. App. 1991) (quoting **State v. Goad**, 707 S.W.2d 846, 853 (Tenn. 1986)). Tennessee Rule of Evidence 103(a)(2) "requires appellants who challenge rulings that exclude evidence to make an offer of proof **unless the substance of the evidence is otherwise apparent**." **Alley v. State**, 882 S.W.2d 810, 815 (Tenn. Crim. App. 1994) (emphasis added). While the better practice may have been for the trial court to allow Appellant's counsel to make an offer of proof, such offer was not necessary given the context of the questioning, *i.e.,* it was attempted on re-direct after lengthy questioning by both parties. *See **id.*** at 816 ("In circumstances in which it is obvious from the record that the proffered evidence could, under no circumstances, be relevant to the issues, a trial court's refusal to grant an offer of proof is not error."). By this point in Attorney Thompson's testimony, the trial court was already aware of her impressions of the parties and her belief concerning the reason for the delay in the administration of the Estate, *see supra*. As to the offer of proof, the trial court specifically ruled:

> . . . I'm not going to allow the question because it's outside the area in which the [c]ourt is going to allow.
>
> Obviously, [Attorney] Thompson took actions that she believed were appropriate based on the order that she had. Okay?

The trial court's denial of an offer of proof does not affect our review of the appellate issues, nor does it necessitate a new trial. Assuming, *arguendo*, that Attorney Thompson would have testified that the actions *she* took were necessary as Administrator of the Estate, such testimony is irrelevant to the issues at trial, *i.e.,* whether *Appellee* breached her fiduciary duty and whether *Appellee* should receive an executor's fee. Indeed, whether Attorney Thompson fulfilled her duty to the Estate and its beneficiaries is a wholly separate question from whether Appellee did so. Accordingly, we conclude that the trial court did not commit reversible error in refusing Appellant's offer of proof.

### ii. Attorney Royal's Testimony[9]

Although Appellant's next issue states that the trial court abused its discretion "in its evidentiary rulings against" Appellant and/or in favor of Appellee, from Appellant's briefing, it appears that this evidentiary issue involves only the following portion of Attorney Royal's testimony:

---

[9] This is Appellant's fourteenth issue on appeal.

[Appellee's Attorney]: As an administrator, have you ever pressured a beneficiary to waive an accounting?

A: I have made the request. I don't think I've ever pressured anybody to waive an accounting.

Q: Are you familiar with the local rules that expressly forbid a coexecutor from pressuring the beneficiary to waive an accounting?

[Appellant's Attorney]: Object to this line of testimony, your honor.

[Appellee's Attorney]: Your Honor, they opened the door. The man has been an administrator before, he's familiar with the rules of the court. I'm not asking him as an expert. I'm asking his personal experience if I may.

[To Appellant's Attorney, Trial Court]: You opened the door.

[Appellant's Attorney]: I understand that, Your Honor. He is referring to a proceeding that . . . is not governed by our local rules, and Mr. Royal would not be familiar with the local rules.

***

[The Court]: He's asking the question so just let him ask the question. You opened the door.

***

[Appellee's Attorney]: So what we have is a situation where a will in Tennessee, of a Tennessee resident leaves property in Florida. . . . The person who was acting executor in Florida is also an executor here in Tennessee. At the end of the ancillary probate in Florida, they asked my client to sign a receipt saying that there were no issues regarding fees, they were waiving accounting, et cetera. It is a voluntary form.

Yet, the coexecutor, still under the authority of this Court in Tennessee, pressured my client to sign that form. The attorney in Florida pressured my client to sign that form. And so the question is have you ever done anything like that in an administration?

A: No, I don't –

- 14 -

[Appellant's Attorney]: I'm going to object to his characterization.

[The Court]: If I follow the question[,] it's overruled.

A: I don't believe I've ever pressured anybody to, to sign an account – sign a waiver of an accounting if they chose not to do so.

I may have asked – I mean, I want to be clear. There have been occasions where I have said we can waive accountings if all parties agree to this, et cetera, et cetera. I don't think I've – certainly don't believe I've ever pressured anybody to do so.

Q: And are you familiar with the local rules that say that's improper?

A: I don't know the rule number so I don't certainly want to misstate the rule number but I know that the local rules speak to accountings and requirements of accountings and things of that nature.

In his brief, Appellant argues that Attorney Royal was not familiar with Florida's probate rules, so Attorney Royal "had no foundation of knowledge to answer [Appellee's] questions." As shown above, Appellee's attorney never asked Attorney Royal to opine concerning Florida law or local rules. First, Attorney Royal was asked if he was "familiar with the local rules that expressly forbid a coexecutor from pressuring the beneficiary to waive an accounting." In his brief, Appellant admits that this question concerned *Shelby County's Local Rules of Probate*. As such, the trial court correctly ruled that Appellant had "opened the door" to such testimony as he established, on direct examination, that Attorney Royal is a practicing attorney in Shelby County with experience in estate administration. Indeed, Appellant's attorney acknowledged that he had opened the door. Following a lengthy narration, the next question posed to Attorney Royal was, whether Attorney Royal had ever pressured anyone to waive an accounting in the administration of an estate. Again, Attorney Royal was not asked to testify as to Florida law or local rules. Accordingly, Appellant's counsel's objection concerned Attorney Royal's "characterization" of the narration and had nothing to do with Attorney Royal's knowledge of Florida law. Regardless, even if we assume, *arguendo*, that it was error for the trial court to allow the foregoing testimony, Appellant's brief fails to provide either a substantive argument or a citation to the record to show that such error had any effect on the trial court's final decision. *See* Tenn. R. App. P. 36(b). Rather, Appellant generally argues that, because the trial court ruled in favor of Appellee on "virtually every issue in dispute," "[i]t is not a stretch to make the connection that [Attorney] Royal's testimony wrongfully cast [Appellant] in a negative light[.]" Contrary to Appellant's position, from our review, there is nothing in the trial court's order to suggest that the foregoing testimony affected its judgment. It is clear from the final order that the trial court based its findings of fact on the parties' extensive testimonies and the trial exhibits, not on an isolated portion

of Attorney Royal's testimony. As such, if there was any error in allowing the foregoing testimony from Attorney Royal, it was harmless.

## C. Estate Administration

We turn now to the issues involving the administration of the Estate. These issues fall into three categories: (1) Appellee's fiduciary duty; (2) damages; and (3) fees.

### i. Fiduciary Duty[10]

Appellant argues that the trial court erred in concluding that Appellee did not breach her fiduciary duty either to the Estate or to Appellant. As Co-Executor, Appellee was operating in a fiduciary capacity during her administration of the Estate. *Mason v. Pearson*, 668 S.W.2d 656, 663 (Tenn. Ct. App. 1983). The law concerning an executor's fiduciary duties when handling an estate is well-established. An executor

> must deal with the estate and each of its beneficiaries in the utmost good faith. *Baker v. Baker*, [] 142 S.W.2d 737, 750 ([Tenn. Ct. App.] 1940). Like any other fiduciary, he [or she] is required to exercise the same degree of diligence and caution that reasonably prudent business persons would employ in the management of their own affairs. *In re Estate of Inman*, 588 S.W.2d 763, 767 (Tenn. Ct. App. 1979); *In re Estate of Cuneo*, [] 475 S.W.2d 672, 676 ([Tenn. Ct. App.] 1971); 2 H. Phillips & J. Robinson, *Pritchard on Wills and Administration of Estates* § 715 (4th ed. 1984).

*McFarlin v. McFarlin*, 785 S.W.2d 367, 369-70 (Tenn. Ct. App. 1989). Furthermore, because the law favors the prompt administration of estates, within a timely manner, an executor has a duty to: (1) marshal and collect the estate's assets; (2) discharge his or her statutory obligations; (3) distribute the estate; and (4) close its administration. *Id.* at 370 (internal citations omitted). Furthermore, this Court has noted that "[a]n executor's performance should be judged in light of the circumstances existing at the time." *Id.* (citing *Young v. Phillips*, 93 S.W.2d 634, 636 (Tenn. 1936)).

Appellant's argument that Appellee breached her fiduciary duties is based on the following alleged actions (or inactions): (1) her delay in transferring the rental properties to Appellant; (2) her requests to share in the residuary estate and for a Co-Executor's fee; and (3) her failure to discharge her obligations as Co-Executor in a timely manner. Some background information is helpful in our analysis of this issue. We begin with the first two areas of disagreement.

### 1. Real Property Transfer and Request to Share in Residuary

---

[10] This section concerns Appellant's first and second issues on appeal.

As noted above, the parties worked well together to administer the Estate for sixteen months. Issues arose when Appellee began discussions with Appellant regarding her executor's fee. Concerning an executor's fee, the Will contained a compensation clause, to-wit:

> If [Appellee] serves as a co-Executor of my estate and is obligated to oversee the disposition of my [r]ental [p]roperties and if the gross fair market value of my [r]ental [p]roperties exceeds one-third of my Gross Estate, I direct that her fee for serving as a co-Executor be no less than 2% of the gross fair market value, as finally determined for federal estate tax purposes, of the assets subject to administration in my estate other than the assets disposed of in Article I [(Pecuniary and Specific Bequests)]. By giving the direction, I do not intend to circumscribe the fee that she may be entitled to but merely to set a floor. Furthermore, by giving this direction, I do not intend that [Appellant], if he serves as co-Executor with [Appellee], not be entitled to an executor's fee.

On March 18, 2020, Attorney Matthew Thornton sent a letter to Appellant and copied Attorney Callison. Therein, Attorney Thornton explained that Appellee had retained him to represent her individual interests in the Estate and stated that he would "like to work with [Appellant] to resolve any differences between [Appellant and Appellee]," with one difference being Appellee's "compensation for all the work she ha[d] done on the rental real properties." The letter indicated that it was Attorney Thornton's understanding that Appellant was "attempting to limit [Appellee] to the 2% minimum" set out in the Will, *supra*. Attorney Thornton concluded by stating that "[i]t certainly saves everyone a lot of money if we're able to work everything out."

Also on March 18, 2020, Attorney Thornton sent a letter to Attorney Callison and copied Appellant. Therein, Attorney Thornton informed the recipients that he was representing Appellee and acknowledged the dispute between Appellant and Appellee. Attorney Thornton requested that Attorney Callison refrain from taking action on behalf of the Estate without the approval and involvement of Appellee. As an example, Attorney Thornton mentioned that Appellant was asking for a deed to be prepared so that the rental properties could be transferred to him. Attorney Thornton noted that he did "not object to the deed preparation itself," but he objected to "any deeds being signed until [Appellee] worked out an agreement with [Appellant] regarding [Appellee's] compensation from the [E]state."

On March 19, 2020, Appellant replied to Attorney Thornton's letter by email. Appellant alleged, *inter alia*, that Appellee had not communicated her expectations for a Co-Executor's fee to Appellant. Appellant further stated: "I noticed your letter was short on specifics; is there a reason you didn't just include her Executor Fee expectations there;

wasn't that the simplest and most obvious thing to do?" Appellant closed his response by stating: "Is it your intention to tell me what [Appellee] wants? Barring that, I'm not sure what you expect from me." In a separate email to Attorney Callison, which was copied to Attorney Thornton and sent at 1:35 p.m., Appellant asked Attorney Callison to set a deadline for Attorney Thornton to provide Appellee's compensation expectations by close of business that day. Appellant stated that if Appellee did not provide her expectations in writing by close of business, he would request that Attorney Callison begin the process of removing Appellee as Co-Executor. In a follow-up email to Appellant, which was sent the same day, Attorney Thornton interpreted Appellant's reply as a request to put a value on Appellee's services. To that end, Attorney Thornton indicated that Appellant "should agree to share in the [E]state with [Appellee] in the amount of $500,000.00."

On April 21, 2020, Attorney Thornton sent a letter to Attorney Gordon Olswing, whom Appellant had retained to represent his personal interests. In this letter, Attorney Thornton stated that he instructed Appellee to "sign the deed granting all of [D]ecedent's real [property] to [Appellant]." Among other things, Attorney Thornton enclosed an Offer of Judgment to resolve all matters. The Offer of Judgment provided that Appellee would receive all that she was entitled to under the Will and that she would also "receive from the share of this Estate passing to [Appellant] the amount of Three Hundred Thousand Dollars ($300,000.00)."

On appeal, Appellant first argues that Appellee breached her fiduciary duty when she "ransomed" the rental properties by withholding her signature on the transfer deed until the issue of her executor's fee was resolved. The record does not support Appellant's argument. Rather, the record shows that, until Appellant's March 2020 request that the rental properties be transferred to him, *Appellant* had asked that the rental properties remain as part of the Estate. Attorney Callison testified that Appellant was negotiating to sell many of the rental properties in bulk, but negotiations fell through in late December 2019 or early January 2020. Attorney Callison further testified that, after the sale fell through, because it had been over one year since Decedent's death, she asked Appellant if he wanted the titles to the rental properties transferred to him, but Appellant stated that he wanted to keep them in the Estate. Appellee's testimony corroborated Attorney Callison's testimony that Appellant chose to leave the rental properties in the Estate. It was only in March 2020 that Appellant made the sudden demand that the rental properties be immediately transferred to him. The record shows that, in response to such demand, Appellee did not object to the "deed preparation itself" to begin the process of transferring the rental properties to Appellant. Furthermore, in April 2020, while the issue of Appellee's executor's fee was pending, Appellee signed the deed to transfer the rental properties to Appellant. Accordingly, there is no indication that Appellee "ransomed" the rental properties.

Appellant also argues that Appellee's "efforts to share in the residuary [e]state were beyond a request for unreasonable, unnecessary[,] and improper compensation[,] [they]

- 18 -

were essentially an attack on the Will without formal contest." Appellant provides no law to support his argument that a request to share in the residuary estate or for a large executor's fee amounts to a breach of an executor's fiduciary duty. Furthermore, the record shows that Appellee's request to share in the residuary estate was simply a starting point in her negotiation of her Co-Executor's fee. Appellee testified that she began her formal negotiations with a $300,000.00 offer "[b]ecause everything with [Appellant] is a negotiation, everything[.]" Appellee went on to testify that during the administration of the Estate, Appellant negotiated Decedent's outstanding credit card debt, CPA fees, realtor's fees, and attorney's fees. Aside from Appellee's testimony, the record shows that Appellant negotiated Decedent's credit card debt as well as Attorney Callison's attorney's fees. While Appellant may view Appellee's negotiations as inappropriate, there is insufficient evidence from which to conclude that Appellee's request to share in the residuary estate or for a large Co-Executor's fee was a breach of her fiduciary duty.

Appellant also argues that Attorney Thornton's comment that it would save all parties "a lot of money" if they were able to come to an agreement constituted a threat against Appellant and extortion. We disagree. Viewed in context with Attorney Thornton's letter, discussed *supra*, Attorney Thornton's comments clearly were made in an effort to encourage settlement negotiations between the parties. Far from a threat or extortion tactic, Attorney Thornton's comments were prescient. The record shows that Appellant expended over $150,000.00 in attorney's fees, and Appellee expended $64,000.00 in attorney's fees in the trial portion of this litigation.

## 2. Statutory Obligations and Closing the Estate in a Timely Manner

Next, Appellant argues that Appellee breached her fiduciary duty by failing to discharge her statutory obligations and by failing to close the Estate in a timely manner. This argument appears to hinge on Appellee's alleged delay in filing a petition to set her Co-Executor's fee. Because an estate cannot be closed until administrative and litigation costs are paid, *see* Tenn. Code Ann. § 30-2-701, Appellant argues that Appellee's alleged "unduly delay" in filing a petition for executor's fees delayed the closing of the Estate. Appellant's argument is unpersuasive for two reasons: (1) Appellee began discussions with Appellant concerning her fee in March 2020; and (2) at the time Appellee made her fee request, there were other outstanding issues that precluded the closing of the Estate.

As discussed above, in March 2020, Appellee began discussions with Appellant concerning her fee request. Protracted litigation ensued. In March 2021, the parties attempted to mediate the outstanding issues but were unsuccessful. On October 5, 2021, Appellee filed a petition to set her fees as Co-Executor. On the same day, Appellee filed a motion seeking return of the personal property Appellant took from the Walnut Bend Home, and the parties continued to dispute ownership of the coin collection (which led to the filing of a motion for declaratory judgment on January 4, 2022, *supra*). Also, on January 4, 2022, Attorney Thompson filed a motion to recoup real property expenses

related to the Florida Condo. Thus, at the time Appellee filed her initial petition to set her fee, there were outstanding issues concerning Decedent's personal property, the coin collection, and the Florida Condo. Given that the foregoing issues remained outstanding at trial (and in this appeal), Appellee's filing of a supplemental petition to set her fees on July 21, 2022 was not the sole issue preventing the Estate from being closed at that time. As such, we affirm the trial court's conclusion that Appellee did not breach her fiduciary duty.

## ii. Damages[11]

Next, Appellant asserts that Appellee's alleged breach of her fiduciary duty resulted in damages to both the Estate and Appellant in the form of additional legal fees and costs. Because we affirm the trial court's conclusion that Appellee did not breach her fiduciary duty to the Estate or to Appellant, this issue is without merit.

## iii. Fees

## 1. Appellee's Co-Executor's Fee[12]

The trial court awarded Appellee $90,000.00 as a Co-Executor fee. Appellant alleges this was error. Much of the evidence concerning this issue is taken from Appellee's testimony, which the trial court found to be "calm, not defensive, and truthful." We are required to defer to this credibility finding. *See **Williams***, 465 S.W.3d at 120.

Appellant devotes a significant portion of his argument concerning this issue asserting that a $500,000.00 executor's fee and a $300,000.00 executor's fee are unreasonable. These arguments are irrelevant to the issue before us as the trial court did not award Appellee an executor's fee of $500,000.00 or $300,000.00; it awarded $90,000.00.

Appellant next argues that Appellee's "actions towards the Estate were unnecessary, and she was not obligated to oversee the disposition of the [r]ental [p]roperties." The basis for this argument is Appellant's contention that the Will directed Appellee to distribute the residuary Estate, including the rental properties, to Appellant "outright." Appellant argues that if Appellee had distributed the rental properties outright, then she would not have performed any of the duties she performed as Co-Executor and would not have been entitled to compensation. As an initial matter, Appellant contradicts his own argument in the "Statement of the Facts" section of his brief. Therein, Appellant states that the Will "directed that the [r]ental [p]roperties would not pass by operation of law [] ***but would be held and administered as part of the Estate by the Co-Executors***." (Emphasis added).

---

[11] This section concerns Appellant's eighth and ninth issues on appeal.
[12] This is Appellant's third issue on appeal.

Indeed, Paragraph 4.02(a) of the Will, discussed further *infra*, provided that, during the pendency of the administration of the Estate, all interests in real property that passed under the Will would "be owned by [the] [E]state and . . . not pass by operation of any law directly to [Decedent's] heirs . . . at [his] death." Furthermore, Paragraph 4.02(b) of the Will directed the "Executor [to] dispose [of] all of [the] [r]ental [p]roperties in an orderly fashion over a period of time reasonable under the prevailing circumstances, using reasonable efforts to preserve their value in the course of the process." Taken together, the foregoing provisions provided that the rental properties would not pass to Appellant by operation of law and would be held in the Estate while the Co-Executors disposed of them "in an orderly fashion over a period of time reasonable under the prevailing circumstances." This contradiction aside, Appellant's argument is unpersuasive for two reasons.

First, the record shows that Appellee performed duties as Co-Executor that were unrelated to the rental properties. These duties included: (1) sorting through Decedent's mail; (2) paying Decedent's bills; (3) sorting through and organizing Decedent's files, including files unrelated to the rental properties; (4) meeting with the Estate's attorney; (5) opening the Estate; (6) reviewing and responding to emails concerning the Estate; (7) working with a CPA to file Decedent's taxes; (8) opening a bank account for the Estate and closing Decedent's personal bank account; (9) assisting the Estate's attorney with addressing any TennCare claims; and (10) meeting with the Estate's attorney regarding a lawsuit filed against the Estate concerning one of the rental properties.

Second, in making his argument, Appellant overlooks the fact that he requested that the rental properties remain in the Estate, *see* discussion above. Additionally, the record shows that Appellant actually *directed* Appellee to help him with administering the rental properties. Appellee testified:

Q: Was there any discussion of duties that you were to carry out or what your responsibilities were if you were . . . agreeing to this?

A: We got a thing from the court saying what our obligations were, our responsibilities and then [Appellant] would send out who was responsible . . . [Appellant] would send out who he thought should be responsible for what.

\*\*\*

Q. And so what were the tasks, administrative duties, that [Appellant] laid out for you?

A. To take care of the rental properties, go to the – get the mail, pay the bills, you know, follow up on anything that needed to be done with the rental properties.

- 21 -

Appellant provided no evidence to rebut this testimony, and it is disingenuous for him to now argue that Appellee is not entitled to a Co-Executor's fee for work she performed *at Appellant's request*.

Finally, Appellant argues that Appellee's "efforts towards or on behalf of the Estate were unnecessary due to Advantage, a full-service property manager managing the [r]ental [p]roperties." Although Advantage performed several duties for the rental properties, such as finding tenants, collecting rents, and making repairs, the record shows that Appellee's and Advantage's responsibilities, while complementary, were separate and distinct. As an initial matter, immediately after Decedent's death, Appellee dedicated a substantial amount of time to organizing and understanding the outstanding obligations of each rental property. Appellee testified that she spent several months sorting through Decedent's home office and files to find the leases and ascertain which rental properties were currently occupied. Appellee organized the paperwork regarding the rental properties and made folders for each property. Appellee testified that this was a particularly challenging task because, in the last two years of his life, "there were a lot of things that [Decedent], kind of, let go." Indeed, Appellee testified that some of the rental properties were under threat of foreclosure for unpaid mortgages, the insurance on some of the properties had lapsed, and taxes were delinquent on some of the properties. Although Appellant brought the mortgages into good standing, Appellee testified that she was responsible for the insurance and taxes, and she paid other bills such as utilities.

The record also shows that Appellee facilitated the transfer of the management of some of the rental properties to Advantage. Before Decedent's death, the properties were managed by either Decedent, Advantage, or a different management company, CrestCore Realty ("CrestCore"). Appellee testified that she determined that it would save the residuary Estate money if the properties were transferred from CrestCore to Advantage, and Appellant agreed to the transfer.

Concerning Appellee's interactions with Advantage, she testified that she mainly worked with one of its employees, Kim Glass, to facilitate the renovation of the rental properties for either rental or sale. The record shows that Appellee and Ms. Glass visited each property to determine whether improvements were required, and Appellee oversaw such improvements. Appellee testified that Appellant *requested* that Appellee accompany the employees of Advantage when reviewing the improvements made to the properties. The record shows that Appellant rarely visited the rental properties. Indeed, Ms. Campbell, the representative from Advantage, testified that Appellant was rarely "on-site," coming into town "maybe . . . three times was all." Rather, Appellee kept Appellant updated on the progress of renovations with emails and pictures. Additionally, Appellee acted as an intermediary between Advantage and Appellant, relaying Advantage's suggestions for improvements and relaying back to Advantage what work they were authorized to perform. The record further shows that Advantage was not involved in the renovation of one of the properties that required total renovation due to a fire. Rather, Appellee oversaw the

construction project and coordinated the renovation with Appellant via email.

Aside from the foregoing, the record shows that Appellee met with investors to help Appellant obtain a bulk sale of some of the rental properties. Appellee testified that Appellant asked her to take one investor on a tour of some of the properties, which she did. Appellee further testified that she met separately with a different investor, whom she found, to discuss the bulk purchase of some of the rental properties. Although these sales ultimately fell through, the record shows that the residuary estate profited greatly from Appellee's efforts.[13] Appellee testified that, after renovations, the gross monthly rental receipts almost doubled. While these profits are undoubtedly the result of the over $250,000.00 Appellant spent renovating the properties, Appellee's involvement in these renovations cannot be ignored or minimized. As Ms. Campbell testified:

Q. I was delighted to hear you say that [Appellee] spent a heavy amount of time there on the front end with your personnel, you and [Ms. Glass], et cetera, working on – taking what was not very organized and getting it to where it was profitable. Am I correct in my summation of what you said?

A. You are correct.

\*\*\*

Q. I heard you reference [Appellee] again earlier about getting it rent ready with [Appellee]. Would you characterize [Appellee's] involvement as active or passive in, in the period of time that's on your spreadsheet?

A. Active.

Q. And was [Appellee], in your experience – not asking you to guess as to her experience with [Ms. Glass]. Was [Appellee], in your experience, there as a representative of [Appellant] who was ultimately going to inherit these properties or did you feel she was trying to work against [Appellant] in, in her advice and consult with regard to your business?

A. It was felt that her presence was there with [Appellant] the same way it was when [Decedent] was alive.

Q. Trying to maximize the value of the property?

---

[13] As an indication of Appellee's dedication to the rental and sale of these properties, the record shows that, when a cleaner failed to show to clean a property before its open house, Appellee brought her own cleaning supplies to the house and cleaned it herself.

- 23 -

A. That is correct.

Q. Trying to maximize the income of the property?

A. That is correct.

The record shows that Appellee's work with the rental properties ended in April 2020. Thereafter, Advantage fully managed the turnkey rental properties.

The foregoing supports the trial court's finding that, from November 27, 2018 until March 19, 2020, Appellant accepted Appellee's work as Co-Executor, including her efforts towards the rebuilding and/or revitalization of the thirty rental properties. Indeed, the record shows that, until Appellee's fee request in March 2020, Appellant believed that Appellee had diligently performed her duties as Co-Executor and deserved a fee. In his testimony, Appellant admitted that he sent an email to Attorney Callison in March 2020, before Appellee began negotiations concerning her executor's fee, stating as much. Specifically, Appellant testified that he wrote that email

> A. . . . to play nice and be collaborative and, and say, Hey, let's go ahead and get the fees so we can close this estate, [Appellee has] been diligently working up until now, and there's no reason she won't do that in that future, aka, provide your fees.

Appellant's attorney clarified Appellant's viewpoint concerning Appellee's actions as Co-Executor:

> Q. So, as you were sitting there in March of 2020, did you feel that [Appellee] and/or [Attorney] Callison were acting diligently in probating your father's estate?
>
> A. Generally speaking, yes, but with the exception of providing their fees and the distribution of the Florida condo.[14]

Appellant's testimony also established his change of position regarding Appellee's executor fee:

> Q. Now were you initially opposed to [Appellee] earning any moneys for her services as an executor?
>
> A. No.

_____

[14] As discussed, *infra*, we affirm the trial court's conclusion that Appellee did not delay in transferring the Florida Condo.

Q. Were you initially willing to pay [Appellee] what you believed a reasonable fee was for her work as executor?

A. Absolutely.

Q. Then what happened?

A. What happened is – what happened is that she sent – her attorney sent an email that said we want $500,000.00, we want you to share in the estate with her for $500,000.00 because of her special relationship with your father.

Appellant testified that the foregoing constituted a "brazen breach of fiduciary duty." As discussed above, although Appellant may view Appellee's negotiations and/or requests as extreme or inappropriate, such request or negotiation did not amount to a breach of her fiduciary duty. Given that the Will provides for Appellee to receive a fee, she is entitled to compensation for her services as Co-Executor—services Appellant requested and admitted Appellee performed diligently.

Notably, in this portion of his brief, Appellant fails to provide any substantive argument concerning the $90,000.00 executor's fee award.[15] However, for completeness, we briefly review the amount of the award. Concerning an executor's fee, this Court has explained:

> Generally, executors are entitled to reasonable compensation for their services and to payment for reasonable expenses incurred in good faith for the necessary benefit of the estate. *In Re Estate of Wallace*, 829 S.W.2d 696, 700-01 (Tenn. Ct. App. 1992); *see* Tenn. Code Ann. § 30-2-606 (1996). The determination of reasonableness is left, in the first instance, to the discretion of the trial court, which is to make that determination in light of all the relevant circumstances. *Id.* at 701; *In Re Estate of Griffith*, 452 S.W.2d 895, 902 (Tenn. Ct. App. 1969). Thus, where the will is silent regarding compensation for an executor, "the executors shall be credited with a reasonable compensation" as determined by the court. *In Re Estate of Perlberg*, 694 S.W.2d 304, 307 (Tenn. Ct. App. 1984) (quoting *Leach v. Cowan*, [] 140 S.W.1070, 1074 (1911)).

---

[15] We note that, in his argument concerning the trial court's denial of his motion for involuntary dismissal, discussed *infra* (E), Appellant mentions the $90,000.00 award in one sentence, to-wit: "At the least, paying [Appellee] a fee of $90,000.00 was gross abuse of discretion when the Local Rules provided a fee of $8,500.00 on an Estate this size and Advantage received $26,233.29 for managing the [r]ental [p]roperties." Appellant provides no citations to relevant law, no citations to the record, and no substantive argument to support this statement.

***In re Estate of Wakefield***, No. M1998-00921-COA-R3-CV, 2001 WL 1566117, at \*9 (Tenn. Ct. App. Dec. 10, 2001). However, where a testator has established in his or her will the executor's compensation, our courts give effect to the testator's intent. ***Id.***; *see also* ***In re Estate of Perlberg***, 694 S.W.2d at 306 ("In Tennessee and in virtually every other jurisdiction that has addressed the issue, where a will specifies that an executor is to receive a certain amount as compensation, or no compensation, for serving as an executor, he [or she], by accepting the appointment, binds himself to the will's terms."). "We must ascertain the testator's intent from the particular words used in the will itself, from the context in which those words are used, and from the general scope and purposes of the will, read in the light of the surrounding and attending circumstances." ***In re Estate of Wakefield***, 2001 WL 1566117, at \*9 (citing ***Moore v. Neely***, 370 S.W.2d 537, 540 (Tenn. 1963); ***Third Nat'l Bank of Nashville v. First Am. Nat'l Bank of Nashville***, 596 S.W.2d 824, 828 (Tenn. 1980)).

As discussed above, the Will provided for a Co-Executor's fee if Appellee served as a Co-Executor of the Estate and oversaw the disposition of the rental properties,[16] which she did. The Will provided that the fee would be no less than 2% of the gross fair market value of the assets subject to administration in the Estate other than the assets disposed of by Pecuniary and Specific Bequests. The Will further provided that, "[b]y giving th[is] direction, [Decedent] [did] not intend to circumscribe the fee that [Appellee] may be entitled to but merely to set a floor."

In calculating Appellee's executor's fee, the trial court found, and the record supports, that: (1) Appellee spent 1,200 hours serving as Co-Executor; and (2) Appellant previously valued Appellee's hourly rate at $75.00 per hour. Accordingly, the trial court determined that $90,000.00 was a reasonable fee for Appellee's services. Appellee does not challenge this amount. Accordingly, the record does not preponderate against the trial court's award of $90,000.00 to Appellee as her Co-Executor's fee.

### 2. Florida Condo Fees[17]

Appellant alleges that the trial court erred in concluding that the Estate was responsible for the expenses related to the Florida Condo. This issue is easily resolved by reading section 4.02(a) of the Will:

> 4.02. <u>Provisions Related to Real Estate</u>
>
> (a). <u>Real Estate Subject to Administration</u>. ***All interests in real property that I may own at the time of my death and that shall pass under this Will shall***, ***during the pendency of the***

---

[16] The parties do not seem to dispute that the gross fair market value of the rental properties exceeded one-third of the gross estate, discussed, *supra*.

[17] This is Appellant's fourth issue on appeal.

***administration of my estate*** or the earlier distribution or other disposition of such property, ***be owned by my estate and shall not pass by operation of any law*** directly to my heirs or devisees under this Will at my death. ***My Executor shall have full possession of and exercise full control over such property during such period***. Until distribution or other disposition of any such property, ***my estate*** shall be entitled to all of the income therefrom and gains from the sale or other disposition thereof and ***shall discharge all of the responsibilities relating to ownership thereof, including, but not limited to, payment of any property taxes***, casualty insurance premiums, utilities, and repairs and maintenance (but not capital improvements) with respect thereto.

(Emphases added). Although, in his appellate brief, Appellant cites the foregoing provision of the Will, he goes on to argue that Tennessee Code Annotated section 30-2-323 "provides limitations on the advances a personal representative can make toward realty." In doing so, Appellant wholly ignores the first portion of the statute: "Unless contrary to the decedent's will . . . ." Tenn. Code Ann. § 30-2-323. As shown above, Decedent's Will clearly provided that all interests in real property owned by Decedent at his death would be held by the Estate and would "not pass by operation of any law." Accordingly, Decedent's Will, not Tennessee Code Annotated section 30-2-323, controls. From the plain language of the Will, *supra*, the trial court correctly concluded that the Estate was responsible for the expenses related to the Florida Condo while the Estate was being administered. As such, Appellee does not owe the Estate for expenses paid towards the Florida Condo before it was transferred to her. However, the Estate owes Appellee the amount she paid for prorated real estate taxes to have the property transferred to her. The trial court found, and Appellant does not dispute, that amount to be $1,900.00. Accordingly, we affirm the trial court's conclusion that the Estate shall reimburse Appellee for the $1,900.00 she paid in prorated real estate taxes.

We note that, in this section of his brief, Appellant briefly argues that Appellee "refused to acknowledge she had received her property," and that Appellee failed to "timely close the Florida probate." To support his contention, Appellant cites: (1) Appellee's counsel's closing argument that Appellee did not delay in transferring the Florida Condo; and (2) three exhibits the trial court excluded from evidence and marked for identification purposes only. Obviously, the first citation does not support Appellant's argument. As to the second citation, because the exhibits were excluded from evidence, and because Appellant failed to argue that such exhibits were wrongfully excluded, we do not consider them.[18]

---

[18] As discussed *supra*, (IV)(A), Appellant wholly failed to provide any argument concerning his thirteenth issue, *i.e.,* whether the trial court erred "by not admitting the exhibits proffered by Appellant." For

The foregoing notwithstanding, the evidence does not preponderate against the trial court's finding that Appellee did not delay in transferring the Florida Condo. As an initial matter, Appellee testified that she was told she was not qualified to serve as a co-personal representative of the Florida ancillary estate. Accordingly, Appellee was not responsible for opening that estate. Appellee further testified that she asked Attorney Callison "on a couple of occasions" what was required of Appellee to transfer the property, and that Attorney Callison said that she "was going to check and get back to [Appellee]." In her testimony, Attorney Callison acknowledged that she was partially at fault for the delay in administering the ancillary probate. Appellee further testified that Appellant did not raise the issue of the transfer of the Florida Condo until March 2020. This testimony is corroborated by exhibit 40, a March 20, 2020 legal services agreement, which was executed by and between Appellant and a Florida law firm. When asked if Appellee was in favor of the transfer of the Florida Condo to her, she testified "Oh, I was in favor of it, absolutely." The record shows that the transfer occurred in September 2020. Given the trial court's credibility findings as to Appellee's testimony, and in view of the other evidence corroborating Appellee's testimony, we conclude that the trial court did not err in concluding that Appellee did not delay in transferring the Florida Condo.

### D. Disputed Property

The next two issues concern disputed property that was awarded to Appellee. The following provisions of the Will are relevant here:

> 1.04. Disposition of Personal and Household Effects. Except for items otherwise specifically bequeathed in this Will or in any codicil to this Will, I give all of my Personal and Household Effects to [Appellee] . . . . It is my hope that [Appellee] will distribute some of these items to [Appellant], but I do not direct her to do so.

> ***

> "Personal and Household Effects." References in this Will to "Personal and Household Effects" mean all of [Decedent's] personal effects and tangible personal property held primarily for personal (as opposed to business) use at the time of [Decedent's] death, including, without limitation, all furniture, library works of art, chinaware, silverware, tools or equipment located in and around a residence of [Decedent's], jewelry, clothing, automobiles and other articles of personal use or adornment.

---

completeness, we note that the three exhibits Appellant cites for support here are ID B-D. Although Appellant argues in certain portions of his brief that these exhibits were excluded, he fails to provide any argument as to why such exclusion was error.

"Residuary Estate." The term "Residuary Estate" means all of the property I own at the time of my death and that passes under the terms of this Will, reduced by (i) all of the Death Taxes, debts, and expenses payable by my estate under Article IV and (ii) all of my property disposed of in Article I, and increased by all Death Taxes recoverable by my estate from persons receiving property passing outside this Will. Without limitation, the term shall include all lapsed legacies and devises, all choses in action, the proceeds of all life insurance payable to my estate not otherwise disbursed or distributed in the course of administration of my estate, and all property with respect to which at the time of my death I have a general power of appointment exercisable in favor of my estate (which I hereby exercise in favor of my estate).

With the foregoing in mind, we turn to the issues concerning disputed property.

### i. Decedent's Coin Collection[19]

Here, we are asked to determine whether Decedent's coin collection is tangible or intangible personal property. Appellant argues that the coin collection is money, *i.e.,* intangible personal property, that should pass to him under the residuary clause of the Will, *supra*. Appellee contends that the trial court correctly determined that the coin collection is tangible personal property that passes to her under the Disposition of Personal and Household Effects provision of the Will, *supra*. The trial court relied on ***In re Estate of Darken***, No. M2016-00711-COA-R3-CV, 2016 WL 7378806 (Tenn. Ct. App. Dec. 20, 2016), for the proposition that a coin collection is tangible personal property. Appellant argues that ***In re Estate of Williams***, 680 S.W.3d 265 (Tenn. Ct. App. 2023), which held that money is intangible personal property, should control. We review both cases below.

In ***In re Estate of Darken***, the decedent bequeathed to his wife "'***all the tangible personal effects including any*** household furniture and furnishings, automobiles, books, pictures, jewelry, art objects, hobby equipment and ***collections***, wearing apparel, and other articles of household or personal use or ornament (excluding cash, choses in action, stocks, bonds or other incorporeal personal property). . . ." ***In re Estate of Darken***, 2016 WL 7378806, at *1 (emphases added). Relevant here, the parties disputed whether the decedent's gold coin collection was tangible or intangible personal property. The trial court found that because the coins were "not cash and [] not legal tender," they were tangible personal property. ***Id.*** at *4. This Court agreed with the trial court that the coin collection was an "investment" rather than cash. ***Id.*** at *9. As such, the Court concluded that the coin collection was not excluded by the parenthetical phrase quoted above. ***Id.*** We note that the language in the Darken will specifically incorporated "collections" as

---

[19] This is Appellant's sixth issue on appeal.

- 29 -

"tangible personal effects" that the decedent wished to bequeath to his wife. Such language is absent from the definition of "Personal and Household Effects" in Decedent's Will, *supra*.

In ***In re Estate of Williams***, the decedent bequeathed to his Wife, all of his "clothing, personal effects, automobiles (together with any policies of insurance thereon) and all of [his] other *tangible* personal property." ***In re Estate of Williams***, 680 S.W.3d at 266-67 (emphasis in original). Relevant here, at issue in ***In re Estate of Williams*** was whether $21,000.00 in cash, which was found in decedent's home after his death, was tangible personal property that should be distributed to the decedent's wife under the above provision of the will. ***Id.*** at 267. In that opinion, we first noted that "there is a wide consensus . . . [that] money is considered an intangible asset." ***Id.*** at 268 (internal citations omitted). We then considered Tennessee Code Annotated section 67-5-501(5), which specifically includes "money" in the statutory definition of "intangible personal property," to-wit:

> "Intangible personal property" includes personal property, such as ***money***, any evidence of debt owed to a taxpayer, any evidence of ownership in a corporation or other business organization having multiple owners, ***and all other forms of property, the value of which is expressed in terms of what the property represents rather than its own intrinsic worth***. "Intangible personal property" includes all personal property not defined as "tangible personal property."

Tenn. Code Ann. § 67-5-501(5) (emphases added). Finally, we considered Black's Law Dictionary's definition of "money," which it defines as "[t]he medium of exchange authorized or adopted by a government as part of its currency." *Money*, Black's Law Dictionary (7th ed. 1999). Given the foregoing, we held that the cash at issue was intangible personal property to which the wife was not entitled. ***In re Estate of Williams***, 680 S.W.3d at 269.

From our review of relevant Tennessee case law, we find another case to be instructive. In ***State v. Sanders***, the Tennessee Supreme Court considered "whether the exchange of gold and silver coins and bullion for dollars constitute[d] the sale of tangible personal property which is subject to sales tax imposed by Tenn[essee] Code Ann[otated] [section] 67-6-101 *et seq*." 923 S.W.2d 540, 541 (Tenn. 1996). The defendant in ***Sanders*** was not registered as a "dealer" with the Department of Revenue under the sales tax statute, but he was advertising and selling gold and silver bullion, coins, and precious metals as a dealer. ***Id.*** The Tennessee Supreme Court framed the issue as "whether the transactions were, as contended by the State, taxable sales of tangible personal property, or, as contended by the defendant, non-taxable exchanges of money for money." ***Id.*** at 542. "Consequently, the nature of the property, tangible or intangible, [was] an important factor." ***Id.***

- 30 -

In its analysis, the Tennessee Supreme Court considered the nature of tangible personal property, money, and intangible personal property, to-wit:

The term "tangible personal property" is defined by Tenn. Code Ann. § 67-6-102(28) as follows:[20]

"Tangible personal property" means and includes personal property, which may be seen, weighed, measured, felt, or touched, or is in any other manner perceptible to the senses. "Tangible personal property" does not include stocks, bonds, notes, insurance, or other obligations or securities. . . .

The defendant insists that gold and silver bullion and coins are money, *i.e.,* intangible personal property not subject to sales tax. Money is defined in the Uniform Commercial Code as "a medium of exchange authorized or adopted by a domestic or foreign government as a part of its currency." Tenn. Code Ann. § 47-1-201(24). Intangible personal property is not defined in Tennessee's tax statutes.[21] However, as used in the law of taxation, intangible property "means such property as has no intrinsic and marketable value, but is merely the representative or evidence of value, such as certificates of stock, bonds, promissory notes, copyrights, and franchises." *Black's Law Dictionary* 809 (6th ed. 1990). This definition is consistent with the specific exclusion of "stocks, bonds, notes, insurance, or other obligations or securities" from the definition of tangible personal property in Tenn. Code Ann. § 67-6-102(28).

*Sanders*, 923 S.W.2d at 542-43. The *Sanders* Court went on to explain that other jurisdictions with similar sales tax statutes "have held that gold and silver bullion and coins are tangible property subject to sales tax." *Id.* at 543 (internal citations omitted). In holding that the coins were tangible personal property, the Tennessee Supreme Court agreed with the State's position that "the transactions on which the defendant failed to collect and remit sales tax were based on ***the intrinsic value of the precious metals rather than their representative value as a medium of exchange***." *Id.* (emphasis added).

Although not from our jurisdiction, the reasoning employed in ***In re Macfarlane's Estate***, 459 A.2d 1289 (Pa. Super. Ct. 1983) follows a similar rationale as espoused by the

---

[20] The statute quoted by the Tennessee Supreme Court has undergone several changes since *Sanders* was decided in 1996. Nevertheless, it still provides the following definition: "'Tangible personal property' means personal property that can be seen, weighed, measured, felt, or touched, or that is in any other manner perceptible to the senses." Tenn. Code Ann. § 67-6-102(97)(A).

[21] As discussed above, "intangible personal property" is now defined at Tennessee Code Annotated section 67-5-501(5).

Tennessee Supreme Court in ***Sanders***.  At issue in ***Mcfarlane*** was whether the decedent's gold and silver coin collection was tangible personal property that passed under the first article of the will or intangible property that passed to a set of trusts under the residuary estate provision.  ***Id.*** at 1290.  In its analysis, the ***Macfarlane*** Court first distinguished tangible from intangible property:

> . . . [I]t has been stated that:
>
>> Tangible property is that which may be felt or touched; property capable of being possessed or realized; . . . that which is visible and corporeal; having substance and body as contrasted with incorporeal rights such as franchises, choses in action, copyrights, the circulation of a newspaper, annuities and the like . . . .  Intangible property is property which has no intrinsic or marketable value, but is merely the representative or evidence of value, such as certificates of stock, bonds, promissory notes, and franchises.
>
> 73 C.J.S. Property § 5 at p. 156 (1951) (footnotes omitted). *See also **Spring v. Lonigro***, 6 Mass. App. 68, 372 N.E.2d 1309 (1978), *app. denied,* 375 Mass. 788 (1978).
>
> Tangible *personal* property has been defined as "[p]roperty such as a chair or a watch which may be touched or felt in contrast to a contract."  Black's Law Dictionary (5th ed. 1979).

***In re Macfarlane's Estate***, 459 A.2d at 1291.  The ***Macfarlane*** Court determined that the will used "the technical words 'tangible personal property,'" which it had defined in the opinion.  ***Id.*** at 1292.  The Court held that "[t]he gold and silver coins [were] clearly tangible property" because they could be "felt or touched."  ***Id.***  The Court further held that

> because the coins have both intrinsic and marketable value in and of themselves, they cannot be considered intangible property, without more. The coins are more than the mere representation or evidence of value, as opposed to stock certificates or paper currency.

***Id.*** (internal citation omitted).

Whether Decedent's coin collection is tangible or intangible property depends on the nature of the collection.  If the coin collection holds an intrinsic or marketable value greater than the representative or face value of the coins, *i.e.,* what is marked on the coins themselves, the coins are tangible personal property that should be bequeathed to Appellee.  By way of an extreme example, in 2019, a rare 1943 copper penny sold at auction for

$204,000.00. Eric Bradley, *Rare 1943 Lincoln Cent Sells for $204,000 at Heritage Auctions*, HERITAGE AUCTIONS (Jan. 11, 2019), https://coins.ha.com/heritage-auctions-press-releases-and-news/rare-1943-lincoln-cent-sells-for-204-000-at-heritage-auctions.s?releaseId=3566. Such sale demonstrates that, while a penny represents .01 cents of value in United States currency, this rare penny had an intrinsic and marketable value far above its representative value. In this way, rare/collectible coins and coin collections are distinguishable from ordinary currency. However, if the value of the coins merely lies in their representative value as United States currency, *see* Tenn. Code Ann. § 67-5-501(5), the coins are intangible property that should be bequeathed to Appellant. For example, if Decedent placed his spare change in a jar every night, collecting coins until the jar was full, then exchanging the coins for cash, such coin collection would be considered intangible property. Indeed, these coins would have no intrinsic or marketable value; rather, their value would lie in their representative value as United States currency. *See **Sanders***, 923 S.W.2d at 542-43. For example, a penny would hold the value of .01 cent, a nickel would hold the value of .05 cents, and so on.

Appellee testified that the coin collection was found inside a briefcase that was inside a locked army locker in the attic of the Walnut Bend Home. She further testified that the coin collection consisted of gold and silver coins, the majority of which were silver. Attorney Thompson testified that there were some foreign coins in the collection as well. In his brief, Appellant states that it is undisputed that the collection consists of coins from various time periods. Black and white photographs of the coin collection appear in our technical record. By this Court's count, over three hundred coins appear in the photographs, with the vast majority being preserved in some form of encasement. From our review, it appears that most of the coins are enclosed in individual coin holders. These coin holders have paper around the outside, with handwritten numbers and words on them. We opine that some of the numbers likely represent the date on the coin, with the oldest coin being dated 1848. While it appears that some of the coins are United States currency, the country names "Columbia," "France," and "Austria" are handwritten on some of the coin holders. Additionally, while this Court recognizes some of the coins as United States currency, *i.e.,* quarters, nickels, dimes, and pennies,[22] there are other coins that we cannot identify. Some of the coins that are not encased in individual coin holders appear to be

---

[22] The only facts this Court may consider on appeal are those "established by the evidence in the trial court and set forth in the record and any additional facts that may be judicially noticed or are considered pursuant to rule 14." Tenn. R. App. P. 13(c). "Judicial notice is 'a method of dispensing with the necessity for taking proof," and "is generally defined as a judge's utilization of knowledge other than that derived from formal evidentiary proof in the pending case." **Counts v. Bryan**, 182 S.W.3d 288, 291 (Tenn. Ct. App. 2005) (internal citations omitted). A judicially noticed fact must be either: (1) "generally known within the territorial jurisdiction of the trial court"; or (2) "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Id.* (citing Tenn. R. Evid. 201(b)). According to Tennessee Rules of Evidence 201(c), a court may take judicial notice whether requested or not. Tenn. R. Evid. 201(c); *see also **Counts***, 182 S.W.3d at 291. We take judicial notice that some of the coins in Decedent's collection are currently used as United States currency.

sealed in a transparent envelope with no handwritten notations on them. There are a handful of coins that appear to be loose and not sealed in any encasement.

The trial court found that the coin collection was "not the same as cash in a decedent's clothing, wallet, or bank account." Rather, it was

> an investment, often retained for its novelty value, similar to a stamp collection. It represents the time spent by an individual accumulating the collection and the collector's interest or passion for the collection. The collection may increase in value, but the investment aspect is not the sole purpose of collecting.

Based on our review of the coin collection, we agree with the trial court. As an initial matter, like the *Macfarlane* decedent, this Decedent's Will specifically bequeathed, to Appellee, "tangible personal property," a technical legal term that is defined in our statutes. In the first instance, the coin collection is tangible personal property because it can be "seen, weighed, measured, felt, or touched[.]" *Sanders*, 923 S.W.2d at 542; *see also* Tenn. Code Ann. § 67-6-102 (97)(A). Furthermore, the nature of the collection demonstrates that it is tangible personal property rather than intangible property. Indeed, the care Decedent apparently took to individually encase and label the coins demonstrates that he intended to collect the coins, rather than use them as currency. Additionally, the evidence shows that there are coins in the collection that are not United States currency. As such, the coins in this collection "have marketable value in and of themselves . . . [and] are more than the mere representation or evidence of value[.]" *In re Macfarlane's Est.*, 459 A.2d at 1292. Although some of the coins in Decedent's collection may have been used as United States currency at one time, the age of these coins indicates that their value now lies in their "intrinsic value" rather than their "representative value as a medium of exchange." *Sanders*, 923 S.W.2d at 543. Accordingly, we conclude that the trial court did not err in determining that Decedent's coin collection was tangible personal property that passed to Appellee under the Will.

### ii. Appellant's Alleged Childhood Items[23]

Appellant's next issue concerns whether the trial court erred in awarding Appellee items of personalty that allegedly belonged to Appellant when he was a child. It is undisputed that Appellant removed certain property from Decedent's Walnut Bend Home during the administration of the Estate. In his brief, Appellant states that he does not contest Decedent's personalty being awarded to Appellee, but he argues that the trial court improperly awarded Appellee certain items that belonged to Appellant as a child. Problematically, Appellant does not specify what items of personal property are at issue. Rather, he broadly references trial exhibit 20. Trial exhibit 20 is an April 3, 2020 email

---

[23] This is Appellant's seventh issue on appeal.

from Appellant's counsel to Appellee's counsel. In the email, Appellant's counsel asks Appellee's counsel, *inter alia*, to confirm that Appellee "previously authorized [Appellant] to take the following personal property and if not, she now authorizes his having taken such property[.]" The email lists sixteen categories of personal property that Appellant removed from Decedent's home, including, but not limited to: (1) "[Appellant's] piggy bank from when he was a child;" (2) "[Appellant's] childhood paperback books;" (2) "[Appellant's] trophies and ribbons from when he was a child;" (3) certain mugs; (4) certain pictures; (5) Decedent's firearms; and (6) Decedent's Army uniform and war medals.

In his brief, Appellant incorrectly asserts that it was Appellee's burden to prove that the disputed items were not Appellant's childhood mementos. On the contrary, Appellee's burden was solely to show that the property Appellant took was bequeathed to her. Appellee satisfied this burden. The proof shows that Appellant removed the foregoing items from Decedent's Walnut Bend Home after Decedent's death. In short, Decedent was in possession of these items at the time of his death. The general rule is "that proof of possession of personal property is presumptive proof of ownership." ***Forman v. Washington***, 3 Tenn. App. 567, 571 (Tenn. Ct. App. 1926). Accordingly, it is presumed that Decedent owned the disputed property. Because Decedent owned the disputed property, it was his to dispose of as he saw fit. The disposition of this property was provided for in the "Personal and Household Effects" provision of the Will, which bequeathed such items to *Appellee* and included "all of [Decedent's] personal effects and tangible personal property[.]" Accordingly, the burden was on *Appellant* to show that certain items belonged to him as a child, and he failed to meet this burden. As the trial court found, Appellant "offered no proof that the items were his," and neither party "presented a stipulation regarding the items of personal property." Given the directives in the Will and the evidence presented, the trial court properly concluded that the items of personal property that Appellant removed, *i.e.,* the list of property in exhibit 20, had been bequeathed to Appellee. Accordingly, there was no error in the trial court's order returning these items to Appellee.

### E. Motion for Involuntary Dismissal[24]

At the close of Appellee's proof, Appellant orally moved for involuntary dismissal of Appellee's claims concerning: (1) an executor's fee; (2) the items of personal property that Appellant argues belonged to him as a child; and (3) Decedent's coin collection. The trial court orally denied the motion at that time. At the close of all proof, Appellant renewed his motion for involuntary dismissal, and the trial court denied same.

A motion for involuntary dismissal does "not raise questions of law but rather challenge[s] the sufficiency of the plaintiff's proof." ***Burton v. Warren Farmers Co-op.***, 129 S.W.3d 513, 520 (Tenn. Ct. App. 2002) (citing ***Smith v. Inman Realty Co.***, 846

---

[24] This is Appellant's fifteenth issue on appeal.

S.W.2d 819, 821 (Tenn. Ct. App. 1992); *Merriman v. Smith*, 599 S.W.2d 548, 560 (Tenn. Ct. App. 1979)).    Tennessee Rules of Civil Procedure Rule 41.02, which governs involuntary dismissals, provides, in pertinent part:

> After the plaintiff in an action tried by the court without a jury has completed the presentation of plaintiff['] s evidence, the defendant . . . may move for dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. . . .

Tenn. R. Civ. P. 41.02(2).    On Appellant's motion, the trial court was required to impartially weigh and evaluate Appellee's evidence, and it was within the trial court's discretion to dismiss her claims if it determined that she failed to make out a prima facie case by a preponderance of the evidence.    *See Burton*, 129 S.W.3d at 520 (citing *Thompson v. Adcox*, 63 S.W.3d 783, 791 (Tenn. Ct. App. 2001)).    On appeal, we review a trial court's disposition of a motion for involuntary dismissal *de novo* with a presumption that the trial court's findings of fact are correct.    *Burton*, 129 S.W.3d at 521; Tenn. R. App. P. 13(d)*; see also Spearman v. Shelby Cnty. Bd. of Educ.*, 637 S.W.3d 719, 731-32 (Tenn. Ct. App. 2021), *perm. app. denied* (Tenn. May 14, 2021).    "The court's legal conclusions are reviewed *de novo* with no presumption of correctness."    *Spearman*, 637 S.W.3d at 731 (citing *Eberbach v. Eberbach*, 535 S.W.3d 467, 473 (Tenn. 2017)).

From our review, at the time Appellant moved for involuntary dismissal, the evidence supported the following findings: (1) Appellee was entitled to an executor's fee; (2) the coin collection was tangible personal property that was bequeathed to Appellee; and (3) Appellee was entitled to have the personal property that Appellant took from the Walnut Bend Home returned to her.    As discussed at length above, we affirm the trial court's: (1) award of a $90,000.00 executor's fee to Appellee; (2) award of the coin collection to Appellee; and (3) order that the personal property be returned to Appellee.    Accordingly, Appellant was not entitled to dismissal, and we affirm the trial court's denial of Appellant's motion.

### F. Attorney's Fees

The parties dispute the issue of the award of attorney's fees both at trial and on appeal.    We address each in turn.

### i. Attorney's Fees at Trial[25]

By order of May 17, 2024, the trial court granted Appellee's motion to alter or amend and awarded her $68,000.00 in attorney's fees to be paid by the Estate.    Appellant alleges this was error.    The trial court found that such fees were "reasonable and necessary

---

[25] This is Appellant's eighteenth issue on appeal.

[for Appellee] to defend herself from unfounded charges of breach of fiduciary duty by a co-fiduciary." In making this finding, the trial court relied on *In re Estate of Wallace* and *In re Estate of Darken* for the proposition that

> [a]n estate should not be charged with an executor's legal expenses if the executor's conduct is at the root of the litigation. Thus, when an executor is charged with breach of its fiduciary duties or when its accounting is challenged, it is the outcome of the proceedings that determines whether the executor's legal expenses incurred in defending against the challenge should be assessed against the estate.

> If the executor successfully defends its conduct, its legal expenses may be charged against the estate. If, however, the account is defective, then the estate should not be charged. If the executor does not prevail completely, or where it is partially to blame for bringing about unnecessary litigation, the executor rather than the estate should be responsible for its legal expenses.

*In re Estate of Wallace*, 829 S.W.2d at 704 (internal citations omitted); *In re Estate of Darken*, 2016 WL 7378806, at \*13. As discussed at length above, Appellee did not breach her fiduciary duty. Accordingly, she is entitled to the legal expenses she incurred in successfully defending her conduct, with such expenses being paid by the Estate. *In re Estate of Wallace*, 829 S.W.2d at 704; *In re Estate of Darken*, 2016 WL 7378806, at \*13. However, from our review, there is insufficient evidence to support the trial court's award of $68,000.00.

It appears that the trial court considered Appellant's trial testimony that he had accrued over $150,000.00 in attorney's fees in the litigation when it found that an award of $68,000.00 to Appellee was reasonable. Appellee relies on the affidavit of her counsel, Attorney Thornton, to support the amount of the attorney fee award, to-wit:

> 9. My two law firms and I incurred, and [Appellee] paid a total of over Sixty-Four Thousand Dollars ($64,000) in fees and expenses (1) defending the false allegations against [Appellee] by [Appellant], (2) pursuing reimbursement and an Executor's fee for [Appellee], (3) and seeking the return of personal property items left to [Appellee] under the [Will] in this Estate.

> 10. Now that the [c]ourt has recognized there was no breach, we are seeking an award of attorney fees and expenses of up to the entire $64,000. But we recognize that, while the legal issues are inextricably intertwined, not all these fees and expenses were specifically incurred in defense of [Appellant's] false sworn charges of breach of fiduciary duty. Additionally, approximately $3,000 in fees were incurred prior to May 7, 2020.

11. Nonetheless, in preparing for and conducting the three-day trial of this matter, the false sworn charges of breach of fiduciary duty permeated all aspects of the case, including pre-trial depositions and discovery, for over three years of this case from May 7, 2020 through trial on August 28, 29, and 30, 2023.

12. Therefore, we [are] seeking, at a minimum, fees and expenses of Forty-Eight Thousand Dollars ($48,000), approximately three-quarters of the total legal fees and expenses incurred and paid out by [Appellee] in this matter to vindicate her efforts as Co-Executor, which greatly benefitted her false accuser, [Appellant].

As an initial matter, Attorney Thornton stated that Appellee incurred $64,000.00 in fees rather than $68,000.00. Furthermore, Attorney Thornton admitted that the $64,000.00 included *all* fees incurred in this litigation and acknowledged that "not all these fees and expenses were specifically incurred in defense of [Appellant's] false sworn charges of breach of fiduciary duty."

On this Court's review, there is no evidence showing the precise amount of fees Appellee incurred in defending against the *breach of fiduciary duty claim*. Furthermore, the trial court's order on fees failed to consider and make any findings concerning the factors set forth in Rule 1.5(a) of the Rules of Professional Conduct to support the reasonableness of the attorney's fees awarded. It is well established that "the reasonableness of the fee must depend upon the particular circumstances of the individual case." ***Wright ex rel. Wright v. Wright***, 337 S.W.3d 166, 181 (Tenn. 2011) (quoting ***White v. McBride***, 937 S.W.2d 796, 800 (Tenn. 1996)). In determining a reasonable fee, courts are instructed to consider the factors set forth in Rule 1.5(a) of the Rules of Professional Conduct:

(a) A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal

services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services;

(8) whether the fee is fixed or contingent;

(9) prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and

(10) whether the fee agreement is in writing.

Tenn. Sup. Ct. R. 8, RPC 1.5(a). A trial court "should develop an evidentiary record, make findings concerning each of the factors, and then determine a reasonable fee" based on the circumstances of the case. *Wright*, 337 S.W.3d at 185-86. As a reviewing court, when trial courts fail to make specific findings concerning the foregoing factors, we often vacate awards for attorney's fees as there is nothing in the trial court's order to justify the awards. *See **Garner v. State***, No. M2023-00812-COA-R3-CV, 2024 WL 3934664, at *8 (Tenn. Ct. App. Aug. 26, 2024). Here, because the trial court failed to consider the factors set forth in Rule 1.5(a) of the Rules of Professional Conduct and because the trial court made no findings concerning same, we vacate the award of $68,000.00 in attorney's fees to Appellee. We remand for a determination of the reasonable amount of attorney's fees Appellee incurred in defending Appellant's breach of fiduciary duty claim only and for entry of judgment on same. In making this determination, the trial court is instructed to consider Rule 1.5(a) of the Rules of Professional Conduct and is directed to make specific findings concerning each relevant factor to justify its award of Appellee's reasonable attorney's fees incurred at trial.

### ii. Attorney's Fees on Appeal[26]

Both parties seek attorney's fees and expenses incurred in this appeal. Appellant's request is based on the presumption that this Court would reverse the trial court and conclude that Appellee breached her fiduciary duties. Because we affirm the trial court's

---

[26] This is Appellant's nineteenth issue on appeal and Appellee's third issue on appeal.

conclusion that Appellee did not breach her fiduciary duties, Appellant is not entitled to appellate attorney's fees.

Appellee argues that she is entitled to attorney's fees and expenses "for having to defend this appeal, including Appellee's continued defense of Appellant's claims for breach of fiduciary duties." As discussed above, if an executor successfully defends his or her conduct, his or her legal expenses may be charged against the estate. ***In re Estate of Wallace***, 829 S.W.2d at 704; ***In re Estate of Darken***, 2016 WL 7378806, at *13. Thus, we grant Appellee's request for appellate attorney's fees. In accordance with the directions above, the trial court shall determine the reasonable amount of appellate attorney's fees Appellee incurred in defending against Appellant's breach of fiduciary duty claim only, and the trial court shall then enter a judgment on same.

As to Appellee's argument that she is entitled to appellate fees and costs on the ground of frivolous appeal, Tennessee Code Annotated section 27-1-122 provides:

> When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include, but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

Tenn. Code Ann. § 27-1-122. "An appeal is frivolous when it has 'no reasonable chance of success,' ***Jackson v. Aldridge***, 6 S.W.3d 501, 504 (Tenn. Ct. App. 1999), or is 'so utterly devoid of merit as to justify the imposition of a penalty.'" ***Whalum v. Marshall***, 224 S.W.3d 169, 181 (Tenn. Ct. App. 2006) (quoting ***Combustion Eng'g, Inc. v. Kennedy***, 562 S.W.2d 202, 205 (Tenn. 1978)). Whether we award frivolous appeal damages rests solely in this Court's discretion, ***Chiozza v. Chiozza***, 315 S.W.3d 482, 493 (Tenn. Ct. App. 2009), and we exercise such discretion "sparingly so as not to discourage legitimate appeals." ***Whalum***, 224 S.W.3d at 181. Based on our review of the record and in the exercise of our discretion, we decline to award Appellee damages on the basis of frivolous appeal.

## V. Conclusion

For the foregoing reasons, we vacate the trial court's award of Appellee's attorney's fees incurred through trial. The trial court's orders are otherwise affirmed. We grant Appellee's motion for appellate attorney's fees, and we deny Appellant's motion for same. Appellee's motion for frivolous appeal damages is denied. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion, including, but not limited to, a calculation of Appellee's reasonable attorney's fees and costs incurred in defending the breach of fiduciary duty claim at the trial and appellate levels. To this end, the trial court is not precluded from reopening proof on this limited question. Once these reasonable fees and costs are determined, the trial court should order them to be paid

to Appellee from the Estate.  Costs of the appeal are assessed to the Appellant, Kevin Price. Execution for costs may issue if necessary.


                                            <u>   s/ Kenny Armstrong            </u><br>
                                              KENNY ARMSTRONG, JUDGE